IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CIVIL ACTION NO.: |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| 1,061,626.435488 USDT, | ) | |
| | ) | |
| Defendant *in Rem.* | ) | |

### UNITED STATES' COMPLAINT FOR FORFEITURE *IN REM*

The Plaintiff, United States of America, brings this complaint and alleges as follows, in accordance with Rule G(2) of the Supplemental Rules for Admiralty and Maritime Claims and Asset Forfeiture Actions.

### NATURE OF THE ACTION

1. This is a civil action *in rem* to forfeit to the United States of America property in consisting of 1,061,626.435488 USDT Tether Cryptocurrency, valued at approximately $1,061,626.44 USD ("United States Dollars"), (hereinafter "Defendant Funds"), pursuant to 18 U.S.C. § 981(b), 18 U.S.C § 981(a)(1)(A) and 18 U.S.C. § 981(a)(1)(C). The United States seeks forfeiture based upon a reasonable belief that the Government will be able to meet its burden of proof at trial to show that the Defendant Funds constitute, or are traceable to:

    a.    property involved in wire fraud transactions or attempted wire fraud transactions in violation of 18 U.S.C. §§ 1343, 1349 and/or conspiracy to commit same;

1

b.     property involved in money laundering transactions or attempted transactions in violation of 18 U.S.C. § 1956(a)(1)(A)(i), and/or § 1956(a)(1)(B)(i);

c.     property involved in an illegal money transmitting business, in violation of 18 U.S.C. § 1960;

d.     proceeds of a money laundering conspiracy in violation of 18 U.S.C. § 1956(h) and;

e.     property involved in money transactions in criminally derived property or attempted money transactions, in violation of 18 U.S.C. § 1957.

## JURISDICTION AND VENUE

2.     This Court has subject matter jurisdiction over an action commenced by the United States pursuant to 28 U.S.C. § 1345, and over an action for forfeiture by virtue of 28 U.S.C. § 1355. This Court has *in rem* jurisdiction over the Defendant Funds pursuant to:

a.     28 U.S.C. § 1355(b)(1)(A), because acts or omissions giving rise to the forfeiture occurred in the District of South Carolina; and

b.     28 U.S.C. § 1355(b)(1)(B), because venue properly lies in this district pursuant to 28 U.S.C. § 1395.

## THE DEFENDANT *IN REM*

3.     The Defendant Funds consist of 1,061,626.435488 USDT Tether Cryptocurrency, seized by agents with the United States Secret Service ("USSS") during an investigation into a transnational criminal organization perpetrating a social engineering and law enforcement imposter scheme. The funds were seized from an associated cryptocurrency

custodial wallet containing an estimated $1,061,626.44 USD and identified by account number xxxxmjajuY1. The subject account is under the control of Tether.

4.    In accordance with the provisions of 19 U.S.C. § 1606, the Defendant Funds have a total domestic value of approximately $1,061,626.44 USD.

## KNOWN POTENTIAL CLAIMANTS

5.    No claimants have been identified for the wallet associated with the seized Defendant Funds.   Law enforcement has received communications from the below email addresses:

1) bb2731651552@gmail.com

2) 2643399476@qq.com

3) r2zask001@keemail.me

## BASIS FOR FORFEITURE

6.    Pursuant to the pleading requirements of Supplemental Rule G(2)(f), Plaintiff alleges that there is a factual basis to support a reasonable belief that the Government will be able to meet its burden of proof at trial to show that the Defendant Funds are subject to forfeiture to the United States, based in part upon the following:

a.    The FBI and local law enforcement agencies are investigating a transnational criminal organization running a romance scheme.  Investigating agents have determined that a fraud group is using social engineering to contact individuals via social media. They convince the victim by creating fake online identities to gain trust and affection ultimately manipulating victims into sending money or sensitive information

3

b.      As set forth below, the Subject Accounts were used by the scammers to receive and launder proceeds of the above-described scheme. Where the Subject Funds cannot be directly traced to the victims discussed in this complaint, they constitute laundered or derivative property found in the same account as the digital currency stolen from victims of this scheme.  The Subject Account was created and used primarily for the purpose of laundering scheme proceeds, including outside of the United States. The Defendant Funds are subject to seizure and forfeiture by the United States.

c.      Digital currency (also known as virtual currency or cryptocurrency) is generally defined as an electronic-sourced unit of value that can be used as a substitute for fiat currency (i.e., currency created and regulated by a government). Digital currencies exhibit properties similar to other currencies, but do not have physical form, existing entirely on the internet. Digital currency is not used by any government or bank (in contrast with fiat or conventional currencies) and is instead generated and controlled through computer software operating on a decentralized peer-to-peer network, often referred to as the blockchain or public ledger. Digital currency is legal in the United States and accepted for legitimate financial transaction. However, digital currency is often used for conducting illegal transactions or for concealing or disguising the true nature, source, location, ownership or control of illegally obtained proceeds. Bitcoin ("BTC") is one of the most used and well-known digital currencies. Ethereum ("ETH") is another popular and commonly used digital currency.

d.    A stablecoin is a digital currency whose market value is attached to or "pegged" to another stable asset. Differing from normal digital currencies, the value of stablecoins are pegged to assets such as fiat currencies like the United States Dollar ("USD") or the Euro, or other types of assets like precious metals or other digital currencies. Stablecoins are thus used to mitigate the volatility in the price of digital currency by mimicking the value of a fiat currency, without actually converting digital currency into fiat. While there are various legitimate uses for stablecoins, they are popular with cyber-criminals who seek to hold digital currency proceeds of crime at a stable or near-fixed value without moving those funds into the legitimate financial system into a fiat currency such as USD. Some examples of stablecoins include:

Tether (USDT) was developed by Tether Limited Inc. and is designed to maintain its value at $1.00 USD. USDT can utilize the existing ETH blockchain or the newer TRON ("TRX") blockchain.

e.    A digital currency exchange (an "exchange") is a business that allows customers to trade digital currencies for other digital or fiat currencies. An exchange can be a brick-and-mortar business, or strictly an online business. Both brick and mortar and online exchanges accept a wide variety of digital currencies, and exchange them for fiat and traditional payment methods, other digital currencies, or transfers between digital currency owners. Most exchanges are located outside the boundaries of the United States in order to avoid regulation and legal requirements, but some popular exchanges operate inside the jurisdiction of the United States. Binance is an example of a popular online exchange that is

located outside of the United States but cooperates with and accepts legal process from American law enforcement agencies.

f.    A wallet is a means of storing digital currency identified by unique electronic addresses that allows an individual to conduct transactions on the public ledger. To access a wallet on the public ledger, an individual must use a public address (or "public key") and a private address (or "private key"). The public address can be analogized to an account number while the private address is similar to a password used to access that account. Even though the public address of those engaging in digital currency transactions are recorded on the public ledger, the true identities of the individuals or entities behind the public address are not recorded. If a real individual or entity is linked to a public address, however, it may be possible to determine what transactions were conducted by that individual or entity. Therefore, digital transactions are often described as "pseudonymous," meaning they are partially anonymous. Most individuals are identified when they use a digital currency exchanger to make a transaction between digital currency and fiat, or through digital currency exchangers that voluntarily or through legal order, cooperate with law enforcement.

g.    The term "Pig Butchering" is a metaphor used to describe a sophisticated, long-term, and high-value type of investment fraud/romance scam. The scam is a multi-stage fraudulent scheme involving social engineering and fraudulent investment platforms and/or cryptocurrency exchanges. The swindler establishes a relationship with the victim, often over weeks or months, through social media or dating apps, building trust and false sense of romantic or professional connection.

This initial phase is the "fattening" phase, where the victim (the "pig") is lulled into a sense of security.

h.     The swindler introduces an illicit investment opportunity, typically involving cryptocurrency (e.g., Bitcoin, Ethereum, USDT) or Forex trading, often claiming to have "inside information" or a special profitable algorithm. The victim is directed to deposit funds onto a platform or application that is entirely fraudulent and controlled by the swindler and merely displays fabricated profits. The victim is initially allowed to see small, verifiable "profits" and may even be permitted to withdraw a small amount of money. This builds confidence and encourages the victim to invest significantly larger sums. Once the victim has deposited the maximum recoverable amount (the "pig is fat"), the swindler executes the "butchering."

(a)     The victim is suddenly unable to withdraw funds

(b)     The platform may display a massive loss, or the swindler may demand a large tax, fee, or deposit insurance to process the withdrawal.

(c)     The swindler and the fraudulent platform then vanish, resulting in the total loss of the victim's invested principle.

**BACKGROUND ON ROMANCE SCAMS RELATING TO CRYPTOCURRENCY**

7.     What is common across many of the romance scams when it comes to cryptocurrency is that by building trust and forging deep emotional connections, scammers can manipulate their victims into making financial decisions they would not normally

7

consider. Victims are often pressured to act fast, making it seem like they are about to miss out on a golden opportunity.

**<u>VICTIM LOSES DIGITAL CURRENCY IN THE SCAM</u>**

8.     On August 26, 2025, Victim 1 filed a police report with Florence Police Department in reference to a romance scam. Criminal Investigator (C/I) Thomas Mattis ("C/I Mattis") was assigned the case.

     a.     C/I Mattis of the Florence Police Department was assigned the case. C/I Mattis spoke with Victim 1 at his residence. Victim 1 said he was contacted initially through Facebook of a younger female. The female asked him to move the messages to WhatsApp. C/I Mattis is aware this is a common tactic used due to the privacy of the end-end encryption offered by WhatsApp. The female identified herself as "Lali Smith". The female presented herself as a younger white female with children. This was corroborated through WhatsApp media.

     b.     Beginning February 2025, "Smith" would bring up investment related questions involving IRA's and 401K's. On February 17, 2025, "Smith" started a conversation regarding investing in bitcoins and told Victim 1 she had invested in "80 bitcoins". Victim 1 told "Smith" he did not understand bitcoins or cryptocurrency.

     c.     On May 23, 2025, "Smith" began explaining cryptocurrency to Victim 1 in more detail. This included how the blockchain worked and its values. "Smith" explained the process of purchasing bitcoin through an exchange.

d. "Smith" used the scheme of "investing in BTC" which is how the profit would occur. The conversation continued on different aspects of BTC. "Smith" told Victim 1that if the price of BTC fell "Smith" could facilitate exchanging the BTC to USDT, which is a different form of cryptocurrency.

e. On May 24, 2025, "Smith" provided information to Victim 1 on downloading "OnChain", which is where "Smith" said she kept her funds. OnChain has been reported as being used for scams. During the entirety of this investigation, Victim 1's OnChain account showed a significant positive balance.

f. On June 19, 2025, "Smith" provided screenshots to Victim 1 on how to add funds to Victim 1's Coinbase wallet. This was Victim 1's first transaction in this scheme. Between June 19, 2025, and August 19, 2025, Victim 1 sent a total of $740,784.09 USD through cryptocurrency. This included purchases of Bitcoin and Ether.

g. On August 26, 2025, C/I Mattis began tracing the last three Ether transactions through Chainalysis, which is a transaction monitoring software platform used for tracing cryptocurrencies and the various blockchain networks.

h. The three transactions through Ether went to the address of 0x999223fb3917825242A1Be5772917789D73e9A7b. After each transaction, the funds were moved to 3MtNbx3rwVGNKGAakG59fRcbmAjDN98Liy. This address was labeled as "COINUNITED.online" and flagged as a scam. C/I Mattis contacted

9

Chainalysis for information regarding intelligence on this address. From this address, the funds went to 0x476b84dFb21F96e52D409Aee6555226121a4C04E, where they did not move for a period of time. C/I Mattis spoke with State Law Enforcement Division (SLED) Special Agent (S/A) Clinton Walker in reference to this case. C/I Mattis provided the transaction details to S/A Walker, who had the same result showing the funds stopped moving.

i.      In total, Victim 1 is at a financial loss of $740,784.48 between all of his transactions to purchase Bitcoin and Ether.

j.      The below is a picture sent from Victim 1 to "Smith" of the COINUNITED.online website, which to date has been taken down.



k.      After filing the initial incident report, Victim 1 attempted to withdraw funds from his COINUNITED.ONLINE account and was sent a message on the platform, which read "Hello you must pay the fees within 15 business days. If you fail to pay by the deadline, you will face significant penalties and the risk of your account being frozen. Please process your payment as soon as possible to avoid unnecessary consequences". Reviewing the messages

10

between Victim 1 and "Smith", Victim 1 was attempting to withdraw "proceeds" from the fraudulent account, which he believed had made a significant profit.

l.    Chainalysis provided the following intelligence on COINUNITED.online:

The website "COINUNITED.online" was identified as a possible 'pig butchering' scam website. We created an account on the website on Jan. 10, 2025, and received the deposit address 3MtNbx3rwVGNKGAakG59fRcbmAjDN98Liy (BTC), and other deposit addresses identified in Reactor, to send funds. We have screenshot information on file if necessary

"COINUNITED.online" was picked up based on a query we're running connecting websites together based on HTTP characteristics.

Specifically, this website is sharing the same file, "home-nav-1.png", that multiple other websites are utilizing we've identified as possible 'pig butchering' websites, as they're mimicking legitimate exchanges: https://urlscan.io/search/#filename:%22home-nav-1.png%22

(As you can see, this list is populating websites that use "Kraken" or "Coinbase" in their domain names).

Additionally, the website "COINUNITED.online" was detected as having Hong Kong and Chinese IP addresses, which are known 'pig butchering' headquarter locations: https://urlscan.io/result/d55e6525-ba96-482c-aabd-70e6321ab301/#summary

Pig butchering' scammers typically create exchange websites that appear to be legitimate and mimic other, more legitimate exchanges.

m.    On September 16, 2025, the funds from 0x476b84dFb21F96e52D409Aee6555226121a4C04E started moving again and went through the Bitget relay to the TRON blockchain. This is a common obfuscation tactic used to hide the origination of the funds and to further money laundering activities.

n.    On September 19, 2025, C/I Mattis sent an official request to Bitget requesting transaction details. After the funds went through the relay, the funds were deposited into TDtXiHiSXKqWyn4JJwWLgSaZ6Em1JqPnY8.

11

o.     On September 24, 2025, C/I Mattis sent an official request to Tether requesting a freeze be placed on the address. Prior to the freeze taking effect, the victim funds were moved four additional times.

p.     On September 25, 2025, Tether responded and froze the address TDtXiHiSXKqWyn4JJwWLgSaZ6Em1JqPnY8.

q.     On September 29, 2025, C/I Mattis sent Tether an official request to freeze the address TWDwwWitHBjcc9gy8eSTQZiDU9WmjajuY1 as it was the last hop containing victim funds.

r.     On September 30, 2025, Tether responded by freezing the second address. As part of cooperation with law enforcement, Tether requested contact information for anyone claiming ownership of either frozen wallet. C/I Mattis provided his official department email.

s.     Between October and November 2025, C/I Mattis received several emails from the following email accounts claiming ownership of the addresses:

       1) bb2731651552@gmail.com

       2) 2643399476@qq.com

       3) r2zask001@keemail.me

t.     SLED S/A Walker and the Regional Organized Criminal Organization Center (ROCIC) verified the trace of the funds. The trace from ROCIC was included with C/I Mattis' case file.

12



7.      Based on the above, the Government will be able to meet its burden of proof at trial to show that the Defendant Funds constitute, or are traceable to:

b.      property involved in wire fraud transactions or attempted wire fraud transactions in violation of 18 U.S.C. §§ 1343, 1349 and/or conspiracy to commit same;

b.      property involved in money laundering transactions or attempted transactions in violation of 18 U.S.C. § 1956(a)(1)(A)(i), and/or § 1956(a)(1)(B)(i);

c.      property involved in an illegal money transmitting business, in violation of 18 U.S.C. § 1960;

d.      proceeds of a money laundering conspiracy in violation of 18 U.S.C. § 1956(h) and;

e.      property involved in money transactions in criminally derived property or attempted money transactions, in violation of 18 U.S.C. § 1957.

13

**CONCLUSION**

8.      By reason of these premises, and pursuant to 18 U.S.C. § 981(f) and 21 U.S.C. § 881(h), whereby the Plaintiff's right, title and interest in and to the Defendant Funds relates back to the commission of the act giving rise to the forfeiture, the Defendant Funds have become and are forfeited to the United States of America, to be disposed of pursuant to Supplemental Rule G(7)(c) for Admiralty or Maritime Claims and Asset Forfeiture Actions, 18 U.S.C. § 981(d), 21 U.S.C. § 881(e), and other applicable laws.

        WHEREFORE, Plaintiff prays that due process issue to enforce the forfeiture of the Defendant Funds, *in rem*; that a Warrant for the Arrest of the Defendant Funds be issued; that due Notice be given to all interested persons to appear, make claim, answer and show cause why the forfeiture should not be decreed; that the Defendant Funds be decreed condemned and forfeited to the United States of America for disposition according to law; and that Plaintiff have such other and further relief as the Court may deem just and proper, together with the costs and disbursements of this action.

                                Respectfully submitted,

                                BRYAN P. STIRLING
                                UNITED STATES ATTORNEY

                                By:  *s/Carrie Fisher Sherard*
                                Carrie Fisher Sherard #10134
                                Assistant United States Attorney
                                55 Beattie Place, Suite 700
                                Greenville, SC 29601
                                (864) 282-2100
                                Carrie.A.Fisher@usdoj.gov

April 28, 2026

14